**UNITED STATES of America ex rel. Willie BUCKHANA and Tony McGhee, Petitioners-Appellants,**

v.

**Michael LANE, Director, Department of Corrections, State of Illinois, Respondent-Appellee.**

No. 85–2049.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 23, 1986.

Decided March 26, 1986.

Donald S. Honchell, Cook County Public Defender, Chicago, Ill., for petitioners-appellants.

James E. Fitzgerald, Asst. Atty. Gen., Chicago, Ill., for respondent-appellee.

Before BAUER, COFFEY, and RIPPLE, Circuit Judges.

COFFEY, Circuit Judge.

Petitioners-appellants, Willie Buckhana ("Buckhana") and Tony McGhee ("McGhee") appeal from the district court order dismissing their petitions for writs of habeas corpus. We affirm.

I

In July 1979, following a trial in the Cook County, Illinois, Circuit Court, a jury found Buckhana and McGhee, along with a third individual named Green (not a party to this action), guilty of burglary and armed robbery. Between trial and sentencing, the petitioners filed motions for a new trial based on information supplied by Jimmy Buckhana, Willie Buckhana's brother. The petitioners filed the following affidavit of

Jimmy Buckhana at the post-trial hearing on their motions for a new trial:

"My name is Jimmy Buckhana and I live at 2114 W. 18th St., Chicago, Illinois. I am the brother of Willie Buckhana one of the defendants in the above case. I attended every hearing of the trial of the case.

On [the] seventeenth day of July I attended the final trial date and when the Jury went in to deliberate the case I remained in the Court Room and from the time Jury went in to the time they came out with the exception of going to the bathroom a couple of times.

About 7:45 p.m. one of the lady sheriffs came out and spoke to the Clerk. She said 'I had told the Jury if they don't reach a verdict in 20 minutes we would have to lock them up for the night because of having to make hotel reservations.'

She was repeating to the Clerk what I had heard her do and say to the Jury. I had heard her knock on the door and tell the Jury that if they don't reach a verdict in 20 minutes that they would have to be locked up for the night. I heard one women say that she can't stay overnight. I waited in the Court Room and the Jury came out about 8:00 p.m. with their verdict."

In response to the defendant's motions, the trial judge noted that Jimmy Buckhana was an "obviously biased witness" and stated "I can't understand how the witness could hear that conversation [between the deputy sheriff and the clerk] if it took place in the courtroom." He further stated, "I suppose it is possible to hear that conversation [between the deputy sheriff and a jury] but I find it difficult to believe that a person would hear one of the women jurors within the jury room say she can't stay overnight." Despite the questions he raised regarding Jimmy Buckhana's credibility, the trial judge "accept[ed] the facts in the affidavit as true for the purpose of this hearing...." The judge concluded that even assuming the facts in the affidavit to be true, there was no showing that the juror who indicated she could not stay over-

night was induced to change her vote by the statement of the deputy sheriff and that the conversation, occurring after eight hours of deliberation, was not at all coercive to the jury or its deliberations. The trial judge pointed out that none of the jurors had informed him that they felt coerced by the possibility of sequestration and denied the motion for a new trial, stating, "I don't believe that any communication of that nature dealing with the housekeeping arrangements of the jury amounts to illegal communication with the jury." Buckhana received concurrent eighteen and seven year terms for armed robbery and burglary respectively, and McGhee was sentenced to concurrent terms of fourteen years for armed robbery and seven years for burglary.

The Illinois Appellate Court affirmed the petitioners' convictions stating:

"Our consideration of this affidavit and of the arguments made in the defendant's brief lead us inevitably to the conclusion that the trial judge was eminently correct in his analysis. The trial judge was undoubtedly better equipped than any other person to determine the central issue as to whether any prejudice resulted to defendants from the subject matter of the affidavit. Actually, we have here a situation in which an attempt is being made to raise a claim of prejudice on the foundation of 'mere conjecture.' *See People v. Lewis* (1975), 60 Ill.2d 152, 158, 330 N.E.2d 857."

*People v. Buckhana,* 99 Ill.App.3d 889, 55 Ill.Dec. 124, 128, 425 N.E.2d 1297, 1301 (1981). Subsequently, the Illinois Supreme Court denied the defendants leave to appeal and the United States Supreme Court denied their petition for a writ of certiorari. 457 U.S. 1122, 102 S.Ct. 2938, 73 L.Ed.2d 1336 (1982).

In September 1982 Buckhana and McGhee filed petitions for writs of habeas corpus in the United States District Court for the Northern District of Illinois claiming that the deputy sheriff's alleged statement that the jury had twenty minutes to reach a verdict or else be sequestered for the night violated their Fourteenth Amendment due process right to a fair and impartial trial. The respondent moved to dismiss the petition on the grounds that the petitioners had failed to exhaust their available state remedies and also on the grounds that the deputy sheriff's statement to the jury did not deny them a fair and impartial trial. The respondent contended that the trial court failed to decide whether the allegations of Jimmy Buckhana's affidavit were entitled to any credence because the court reasoned that his allegations, even if true, did not demonstrate prejudice to the petitioners. According to the respondent, the petitioners should establish the factual premises for their claims in state post-conviction proceedings before petitioning the federal district court for a writ of habeas corpus. The petitioners countered that both the Illinois state trial and appellate courts ruled on the merits of their claim and that any attempt to further litigate their claims pursuant to the Illinois Post-Conviction Hearing Act, Ill.Rev.Stat. ch. 38, § 122-1 et seq., would be barred by *res judicata*. The district court referred the motion to dismiss to a magistrate, who concluded that the record from the state trial and appellate proceedings would not permit a federal court to make an intelligent decision on the petition as the state court trial judge made no finding as to whether the alleged communication between the deputy sheriff and the jury ever transpired. The magistrate recommended the petition be dismissed so that the petitioners could develop an adequate and complete record in the state court regarding the deputy sheriff's contact with the jury. The district court rejected the magistrate's recommendation, concluding that "by accepting the facts in the affidavit as true, the court effectively held that the events alleged in the affidavit did in fact occur," and noting that both the Illinois trial and appellate courts ruled on the merits of the petitioners' claim. According to the district court, the case law interpreting the Illinois Post-Conviction Hearing Act demonstrates that it would be futile to force the petitioners to bring a collateral attack

when the matter has previously been argued on direct appeal. In addition to denying dismissal on exhaustion grounds, the district court also denied the respondent's motion to dismiss the habeas petition on the merits, reasoning that the deputy sheriff's comments to the jury were presumptively prejudicial under the rule announced in *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), and the state failed to rebut the presumption and demonstrate that the deputy sheriff's communication to the jury was harmless. The district court subsequently held a hearing at which the respondent introduced the testimony of six of the jurors from Buckhana and McGhee's trial and the petitioners introduced the testimony of Jimmy Buckhana. Following the hearing, the parties deposed a seventh juror who was unable to attend the hearing due to illness.[1]

At the district court hearing, juror Ann Chamberlain testified that jury deliberations in Buckhana and McGhee's trial began around mid-day, and "much later" in the jury deliberations a male bailiff interrupted the jury's deliberations, wanting to know if the jury should be put up for the night or "if [the jury] were going to have anything eventually in the near future as to a decision." According to Chamberlain, when the bailiff made this statement to the jury, "We were just about through. We had made up our mind pretty well by the time he entered so we just said, 'just give us a few more minutes.'" Chamberlain testified further that "we already had made up our minds on two of them [the defendants] and we were zeroing in on the last one and we had just about concluded on that one because we deliberated individually." Upon further direct examination, Chamberlain explained that they had already reached a verdict on Buckhana and Green at the time of the interruption. Chamberlain also related that she would not have had any problem with staying in a hotel if necessary. The counsel for the respondent asked Chamberlain on direct examination, "When the statement by the

bailiff we [sic] made, did you, as a juror, feel any pressure in order to reach a verdict?" To which Chamberlain replied, "I personally did not feel any pressure at all." On cross-examination, Chamberlain acknowledged that after the bailiff had come to the door, one of the jurors, an older lady who lived alone with a dog, complained about the possibility of having to stay overnight. Chamberlain also testified on cross-examination that the jurors had not signed a verdict for any defendant at the time of the bailiff's interruption.

Juror Ann Sabo was unable to recall the names of the defendants in the trial, but did recall that after one-half hour to forty-five minutes of deliberations, a female deputy sheriff came into the jury room and told the jury that if the jury had not reached a decision by a certain hour, she would have to be notified in order to arrange hotel accommodations. Sabo testified that she would have had no problem if required to stay in a hotel that night, and also stated that she felt no pressure when she heard the deputy sheriff's statement concerning sequestration. Counsel for the respondent asked Sabo whether the deputy's comment had any effect on her as she deliberated, to which Sabo answered no. On cross-examination, Sabo related that after the deputy's comment, a juror announced that she lived alone and had a pet to take care of and if the jury did not bring a verdict, she would have to leave. Sabo also stated on cross-examination that at the time of the deputy sheriff's comment, no verdicts had been signed for any defendant.

Juror Paul Knoppel testified that the jury was pretty much in agreement on the verdicts of Buckhana and McGhee, but there was considerable deliberation regarding the third defendant, Green. Knoppel was unable to recall any court personnel knocking on the door and speaking to the jury about having to stay overnight if a verdict was not reached. Upon further

---

**1.** The parties stipulated that two of the twelve jurors from Buckhana and McGhee's trial were

deceased and they were unable to locate the three other jurors.

questioning by the court, Knoppel related that he had no recollection of any woman juror expressing a concern about staying overnight.

Neither juror Cynthia Neimeier nor juror Elijah Harper could recall any court personnel coming to the jury room discussing the possibility of staying overnight if a verdict were not reached soon.

Juror Martin Glauner testified that the jury deliberated first on Buckhana, then on McGhee, and third on defendant Green. Glauner stated on cross-examination that the deliberations concerning Green took quite a bit longer then the deliberations for the other two defendants. Glauner was unable to remember either anybody entering the jury room to tell the jury that they would be sequestered if they didn't reach a verdict or any juror stating that she could not stay overnight.

The petitioners called Jimmy L. Buckhana who testified that he sat in the courtroom while the jury was deliberating. According to Buckhana, at around 7:45 p.m. a female sheriff went to the jury room, came back into the courtroom, and said the jury "[was] still on another person's case, they haven't reached my brother's case yet, Tony and Willie's." Jimmy Buckhana also testified that the sheriff told the jury that they had fifteen to twenty minutes to reach a verdict otherwise they would have to be "locked up" for the night. Buckhana also asserted that he heard a woman juror "holler out loud that she could not stay the night," and the sheriff then returned to the courtroom and told the bailiff what had happened. Within ten to fifteen minutes, Buckhana related, the jury came out with the three guilty verdicts.

Following the hearing, counsel for both parties deposed Loretta Wesson, who testified that she was unable to recall anybody from the court approaching the jury and telling the jury that they had only twenty minutes to deliberate before they would be put up for the night. Wesson stated that she would have stayed overnight if that were necessary. On direct examination, the counsel for the respondent asked Wesson, "Did you allow outside influences to determine your determination of guilt, in other words, other than the evidence, to help you come to the conclusion that these people were guilty?" To which Wesson responded no. On cross-examination, Wesson acknowledged that she had lived alone, kept a dog as a pet, and stated that two of her neighbors had keys to her house in order to take care of her dog if she were unable to.

On the basis of the jurors' and Jimmy Buckhana's testimony, the district court found: (1) that a deputy sheriff did tell the jury that if verdicts were not reached, they would be sequestered for the night; (2) that an elderly woman juror who lived alone expressed concern about the care of her pet dog if the jury were sequestered; (3) that the jury considered the evidence against the defendants in the order they were charged, starting with Buckhana and McGhee; (4) that the deputy sheriff's statement to the jury occurred after the jury had agreed to verdicts regarding Buckhana and McGhee, but before a verdict was reached concerning Green; (5) that all the jurors who testified denied that any communication to them affected their deliberations or verdicts; and (6) that the jury verdicts were not hastened by the contact with the deputy sheriff. Based upon these findings of fact, the district court concluded that the communication from the deputy sheriff was harmless as the jury had already decided on verdicts regarding the petitioners, and as an alternate holding, the district court ruled that the respondent established that the statement lacked prejudice because the verdicts were not the result of or affected by the deputy sheriff's statement. The petitioners appealed, contending that the respondent failed to rebut the presumption of prejudice resulting from contact with a deliberating jury as there was insufficient evidence to support the judge's finding that the jury had reached verdicts as to Buckhana and McGhee before the deputy's statement, and also arguing that the district judge improperly considered testimony elicited from the

jurors in violation of Federal Rule of Evidence 606(b).

## II

Initially, we must determine whether the petitioners have fully exhausted their available state remedies as "it has been settled for nearly a century that a state prisoner must normally exhaust available state remedies before a writ of habeas corpus can be granted by the federal courts." *Duckworth v. Serrano,* 454 U.S. 1, 3, 102 S.Ct. 18, 19, 70 L.Ed.2d 1 (1981); *see* 28 U.S.C. § 2254(b). "This exhaustion requirement is a reflection of the fact that unnecessary conflicts between federal and state tribunals should be avoided. If a state court, which is bound to guard and protect rights secured by the Constitution, stands prepared to afford a prisoner a meaningful remedy, a federal court must refrain from exercising its habeas corpus jurisdiction." *Perry v. Fairman,* 702 F.2d 119, 120 (7th Cir.1983). The respondent contends that the petitioners here have failed to exhaust their available state remedies in that they failed to seek relief in Illinois state court pursuant to the Illinois Post-Conviction Hearing Act, Ill.Rev.Stat. ch. 38, § 122–1 prior to filing their present habeas petitions in federal court. We explained at some length the function of the Illinois Post-Conviction Hearing Act in *United States ex rel. Williams v. Brantley,* 502 F.2d 1383, 1385 (7th Cir.1974):

"The statute itself appears to provide a broad remedy for Illinois prisoners who claim to have been denied constitutional rights. The Illinois Supreme Court, however, has virtually eliminated the remedy for any prisoner who has taken a direct appeal of his conviction. A long line of cases has developed a strict *res judicata* and waiver doctrine:

'We have consistently held that where a convicted person has appealed from the judgment of conviction, the judgment of the reviewing court makes *res judicata* all issues actually decided by that court and all issues which could have been presented to that court and which were not are considered to have been waived.' *People v. James,* 46 Ill.2d 71, 263 N.E.2d 5 (1970).

Thus, in the absence of unusual circumstances, after a direct appeal has been taken 'there ordinarily will be available no collateral remedy under Illinois law' for any issue that 'arises from facts wholly within the record.' "

*See also Perry,* 702 F.2d at 121. The respondent conceded in his motion to dismiss that the petitioners' claim, having been raised on direct appeal, would normally not be cognizable under the Post-Conviction Hearing Act since Illinois law provides that such issues are governed by the doctrine of *res judicata.* The respondent asserts, however, that since the trial judge failed to make findings of fact on the allegations in Jimmy Buckhana's affidavit, the petitioners' claim is based on facts outside the record, and consequently Illinois post-conviction relief is available. It is true that the trial judge expressed skepticism regarding the credibility of Jimmy Buckhana's affidavit and never made a specific finding of fact on the record concerning the facts alleged in the affidavit; nevertheless, for the sake of disposing of the motion, the trial judge assumed the facts to be true and addressed the merits of the petitioners' claim, finding no prejudice arising from the alleged contact with the jury. Thus, there technically are no findings of fact in the state court record to support the petitioners' habeas claim since the trial court failed to specifically find that the alleged contact did in fact occur. As the petitioners' claims are based on facts not "wholly within the record," it would appear that the petitioners have recourse to Illinois post-conviction proceedings. Yet, "we need not direct a petitioner to pursue state remedies if the pursuit would be futile in the sense that we know that the state court would reject the claim." *United States ex rel. Tonaldi v. Elrod,* 716 F.2d 431, 435 (7th Cir.1983). "The concerns of comity that underpin the exhaustion requirement would not be advanced by requiring prisoners to file for post-conviction relief with the near

certainty that no Illinois court would consider their constitutional claims." *Perry,* 702 F.2d at 121. Although the facts supporting the petitioners' habeas claims were not wholly within the state trial court record, we conclude that requiring the petitioners to pursue further remedies under the Illinois Post-Conviction Hearing Act would be futile as the Illinois appellate court has previously rejected the petitioners' claims on the merits, and the petitioners' post-conviction claims would thus be barred by the doctrine of *res judicata.* Consequently, we address the merits of the petitioners' habeas corpus claims.

### III

"In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with the full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and a hearing of the defendant, that such contact with the juror was harmless to the defendant."

*Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954). In the present case, neither party disputes the district court's finding that a deputy sheriff contacted the jury, stating that if verdicts were not reached "eventually—in the near future," the jury would be sequestered for the night. As the statement allegedly questioned the amount of time necessary for the jury to avoid being sequestered so that arrangements for housing could be made if necessary and was made without the full knowledge of the state and the defendants or their counsel, the district court determined that the contact with the jury was presumptively prejudicial as explained in *Remmer.* Consequently, we focus on whether the respondent has satisfied the burden set forth in *Remmer* of

establishing that the contact with the jury was harmless to the petitioners.

### A.

■ The petitioners contend that the district court's conclusion that verdicts had already been reached as to Buckhana and McGhee at the time of the deputy's contact with the jury is not supported by the law or the facts. According to the petitioners, only juror Chamberlain testified that the jury had reached a verdict before the contact, yet she testified that the decision had been reached as to Buckhana and Green, but not as to McGhee. The petitioners argue that because no other juror could specify the time when the verdicts were reached, there is no support for the district court's finding that the verdicts had been reached concerning Buckhana and McGhee before the contact with the deputy sheriff.

The time at which the jury reached agreement on the verdicts of Buckhana and McGhee is a question of fact, and we defer to the district court's findings of fact unless clearly erroneous. Fed.R.Civ.P. 52(a); *see also Anderson v. City of Bessemer City,* —— U.S. ——, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); *SEC v. Suter,* 732 F.2d 1294, 1300 (7th Cir.1984). As the Supreme Court stated in *Anderson,* "a finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* 105 S.Ct. at 1511 (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). When deciding whether a finding of fact is clearly erroneous, this court "cannot reweigh the evidence. The inquiry is whether the record contains substantial evidence to support the findings." *DePass v. United States,* 721 F.2d 203, 205 (7th Cir.1983). Thus, as the Supreme Court explained in *Anderson:*

"If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the

trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."

105 S.Ct. at 1512.

In the present case, juror Knoppel testified that the jury was "pretty much in agreement" regarding the verdicts of Buckhana and McGhee, but engaged in further deliberation regarding the third defendant (Green). Juror Glauner testified that the jury deliberated first on Buckhana, then on McGhee, and last on Green, and also that the deliberations over Green's guilt lasted "quite a bit longer" than the deliberations over the other two defendants' guilt. Juror Chamberlain testified that the jurors "already had made up [their minds] on two of them [Buckhana and Green] and were zeroing in on the last one [McGhee] and we had just about concluded on that one because we deliberated individually." Juror Sabo testified that no agreement had been reached on any of the defendants at the time of the contact with the deputy sheriff. Jurors Neimeier, Harper, and Wesson were unable to recall either the order of the deliberations or any statement by the deputy sheriff concerning the possibility of being sequestered. Thus, Knoppel's and Glauner's testimony provide substantial evidence that the jury deliberated first with respect to Buckhana and McGhee and reached agreements on their verdicts before deliberating Green's guilt. Their testimony also established that the deliberations over Green's guilt took longer than either Buckhana or McGhee's deliberations. Juror Chamberlain's testimony also provides evidence that the jury had reached verdicts on two of the three defendants at the time of the contact with the deputy sheriff, although her recollection of the order of deliberation differed from that of the jurors Knoppel and Glauner. Chamberlain further testified that the jury deliberated only fifteen to twenty minutes following the contact with the deputy sheriff and Jimmy Buckhana also stated that ten to fifteen minutes passed between the deputy sheriff's statement to the jury and the

jury's return to the courtroom with guilty verdicts. The deliberations lasted several hours (approximately eight hours according to the state trial court judge) and thus the jury fully considered each petitioner's innocence or guilt individually, thoroughly, and separately. In view of the length of the deliberations, with the interruption occurring in the last fifteen to twenty minutes, and the fact that Knoppel and Glauner testified that the jury's deliberations over Green took place after Buckhana and McGhee's guilt had been determined and lasted "quite a bit longer" than the deliberations over Buckhana and McGhee, there is substantial evidence in the record to support the district court's finding that the deputy sheriff's statement to the jurors was made after the jury had reached verdicts with respect to Buckhana and McGhee and had no influence on them as testified to. Although the evidence might also be construed to support an opposite finding, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 105 S.Ct. at 1512. Thus, we hold that the district court was not clearly erroneous in finding that the deputy sheriff's statement to the jury occurred after the jury had agreed to verdicts regarding Buckhana and McGhee.

Buckhana and McGhee nevertheless claim that the state never established that their guilty verdicts had been signed by the jurors at the time of the deputy sheriff's statement to the jury, and argue that since a jury determination is not binding or effective until signed, no legally binding verdict was reached at the time of the intrusion. However, the testimony of jurors present in the room who heard what was said provides substantial evidence to support the district court's finding that the jury had fully discussed and made up their minds on the guilt of Buckhana and McGhee when the deputy sheriff spoke to the jury. It is true that in Illinois, "the finding of a jury does not become a verdict until it has been received, accepted by the court and recorded of record. In other words, a verdict is

not final until pronounced and recorded in open court." *People v. Rehberger,* 73 Ill. App.3d 964, 29 Ill.Dec. 838, 840, 392 N.E.2d 395, 397 (1979); *see also People v. McGrenera,* 108 Ill.App.3d 953, 64 Ill.Dec. 355, 359, 439 N.E.2d 1020, 1024 (1982). If we were to adopt the petitioners' suggested analysis, we would require a retrial of any case where an allegedly prejudicial contact with the jury occurred at any time up until the moment the verdicts were accepted in open court, even though harmless, merely because the contact would have occurred before the verdict was technically final and binding. The question before us under *Remmer* is whether the contact with the jury was harmless, not whether all the formal procedures of entering a verdict were completed at the time of the contact with the jury; when a jury contact is presumed to be prejudicial under *Remmer* and occurs after the jury has made up its collective minds regarding the guilt of a defendant, but before the completion of the formality of signing the verdict and presenting it to the judge for acceptance, we do not agree that the defendant is prejudiced. Since the district court properly found that the deputy sheriff's statement to the jury concerning sequestration occurred after the jury had agreed on verdicts regarding Buckhana and McGhee, we hold that the deputy sheriff's contact with the jury was not prejudicial, therefore not improper and thus was harmless.

### B.

■ The petitioners also attack the district court's alternate holding that the verdicts were not the result of or affected by the deputy sheriff's statement with the jury on the grounds that the district court improperly considered the testimony of jurors regarding whether the deputy sheriff's communication had an impact on the jurors in reaching the guilty verdict. The petitioners assert that considering the jurors' testimony that their verdicts were not influenced by the deputy sheriff's statement violated Federal Rule of Evidence 606(b). Rule 606(b) provides:

"Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the affect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a jury may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror."

Determining whether the government has established contact with the jury to be harmless is complicated by the rule's proscription against questioning jurors directly about the effect of outside contact on their deliberation. *Owen v. Duckworth,* 727 F.2d 643, 646 (7th Cir.1984).

"So far as the testimony of trial jurors is concerned, the district court's inquiry into the validity of a verdict is governed by Fed.R.Evid. 606(b). The Rule was designed to protect the entirety of the jury's deliberative process, including arguments, statements, discussions, mental and emotional reactions, and votes. Fed. R.Evid. 606 Advisory Committee Note. The Rule does allow jurors to testify as to whether extraneous information or an outside influence reached them. However, it prohibits jurors from giving post-verdict testimony as to whether their deliberations, in fact, were prejudiced by the extraneous information or outside influence."

*Wiedemann v. Galiano,* 722 F.2d 335, 337 (7th Cir.1983). "The Rule thus limits the district court's inquiry into possible jury prejudice to findings of fact at two separate levels: 'First, the district court must find the basic, or subsidiary, facts—e.g., the nature, content, and extent of the extra-judicial contact. Based on its findings of subsidiary facts, the district court must then make the ultimate factual determination: whether the contact likely affected the jurors' impartiality.'" *United States*

*v. Green,* 779 F.2d 1313, 1322 (7th Cir. 1985).

██ In the case at bar, the counsel for the respondent asked the following questions of the jurors: Juror Chamberlain—Q. "When the statement by the bailiff [was] made, did you, as a juror, feel any pressure in order to reach a verdict?" A. "I personally did not feel any pressure at all."; Juror Sabo—Q. "When you heard the deputy's comment, did it have any effect on you as you deliberated?" A. "No."; Juror Neimeier—Q. "Was your decision on the verdicts of guilty based solely on the evidence that you heard in the courtroom at that time?" A. "Yes."; Juror Harper— "Was your decision on the verdicts as to each of the defendants based solely on testimony that you heard in the courtroom at that time?" A. "Yes."; Juror Glauner —Q. "Was your decision as to each of the defendants that they were guilty ... based solely on the evidence that you heard in the court?" A. "Yes."; Juror Wesson—Q. "Did you base your verdict of guilt upon the evidence that you heard in the courtroom?" A. "Yes." and Q. "Did you allow any outside influences to determine your determination of guilt, in other words, other than the evidence, to help you come to the conclusion that these people were guilty?" A. "No." In responding to the questions recited above, each juror stated, in effect, that their deliberations and hence the guilty verdicts were not affected in any manner, shape, or form by the deputy sheriff's statement mentioning the possibility of sequestration. We believe the intent of Rule 606(b) is to prohibit the questioning of jurors regarding the effect of extraneous information, such as newspapers, television, other media information, or personal contact directly concerning the guilt or innocence of the defendants on trial, on the deliberations of the jurors. As the alleged statement by the deputy sheriff in the present case pertained only to a housekeeping matter (the possible necessity of arranging for overnight accommodations for the jury), we conclude that questioning the jurors as to the effect of the alleged statement on their deliberations was not improper under Rule 606(b). On the basis of the juror's answers to the above recited questions (that they were not influenced by the deputy sheriff's alleged comment), the district court correctly concluded that the jury's verdicts were not the result of or affected by the deputy sheriff's purported statement to the jury. In addition, both jurors Chamberlain and Sabo testified that the juror who reacted to the deputy's statement concerning the possibility of sequestration was a woman who lived alone and had a pet dog at home; according to the testimony adduced, the only juror who satisfies this description was juror Wesson. Wesson could not recall any court official making a statement regarding the possibility of being sequestered if the jury could not reach a verdict, but she did testify that two of her neighbors had keys to her home in order to care for her pet dog when necessary and that she would have stayed overnight if she had to. As Wesson was the only juror who seemed to satisfy the description of the juror who allegedly reacted to the deputy sheriff's statement, and she testified that she was willing and able to stay overnight if necessary, her testimony provides additional support for the district court's finding that the verdicts were not influenced by the deputy sheriff's statement. We hold that the district court did not err in concluding that the jury's verdicts were not the result of or affected by the statement of the deputy sheriff that the jury would be sequestered overnight if unable to reach a verdict within fifteen to twenty minutes.

## IV

The order of the district court is AFFIRMED.