Maria McLAIN, Plaintiff,

v.

. GENERAL MOTORS CORPORATION,
et al., Defendants.

Superior Court of Delaware,
New Castle County.

Submitted: Nov. 5, 1987.
Decided: Aug. 1, 1988 *.

See also 569 A.2d 579.

* Selected for Publication Feb. 7, 1991.

David H. Erisman of Cooch and Taylor, Wilmington, for the plaintiff.

Somers S. Price, Jr., and Laurie Selber Silverstein of Potter, Anderson and Corroon, Wilmington, for defendant General Motors Corp.

Stephen P. Casarino, and Sherry Ruggiero of Tybout, Redfearn, Casarino & Pell, Wilmington, for defendant Eva M. DaPollo.

Thomas J. Dellavecchio, c/o Eugene J. Maurer (former counsel), Wilmington, for defendant.

## OPINION

GEBELEIN, Judge.

This matter is before the Court on plaintiff's motion for new trial and defendant General Motors Corporation's [G.M.] motion for judgment notwithstanding the verdict (J.N.O.V.). For the reasons that follow, both motions are denied.[1]

Maria McLain, ["plaintiff"], filed a products liability action against the defendants, claiming that she suffered personal injuries allegedly caused by a defectively designed seat belt restraint in a car manufactured by G.M. Trial in the case commenced before a twelve-member special jury on October 5, 1987. Twenty-three days later, on October 28, this Court instructed the jury, and sent them to deliberate. Jury deliberations continued through the following day, and at approximately 3:15 p.m. on October 29, the Court was notified that the jurors had a question. Prior to bringing the jury

back in, the Court informed counsel that the jury's written question stated, "The jury is hung on question number one 11 to 1. We need a little help." After a brief discussion, the Court informed counsel of · its proposed response and indicated how it would proceed. The Court said:

Okay. We will bring them in. What I will tell them, that would involve me commenting on the evidence, which I'm not allowed to do, since they are the judges of the facts of the case. We will see if that brings any movement, and if they haven't reached a verdict by the end of the day, then we will bring them back tomorrow and probably give them an Allen charge tomorrow.

No objections were voiced to this suggestion by counsel for plaintiff or defendant.

The jury returned at 3:45 p.m. At that time, the Court informed them that their question was related to the facts, and not to the law, and that the Court could not help them with their deliberations. The jury then retired to deliberate further.

At 4:23 p.m., the jury returned with a verdict. The Court read the first special interrogatory question: "Do you find that General Motors Corporation was negligent by its failure to properly design and locate the seat belt retractor in the 1981 Firebird?" The forelady responded "No". The Court then asked the jury to harken to that verdict: "So say you all?" All jurors, including Juror # 3, responded affirmatively. The special verdict sheet, signed by all twelve jurors, was taken by the Court, and judgment was entered in favor of the defendants. The jury was then dismissed.

On November 5, 1987, plaintiff filed a motion for new trial based upon post-verdict *ex parte* communications which occurred between a juror and the attorneys and a paralegal of plaintiff's counsel. Plaintiffs' motion states that following the verdict, Juror # 3 approached the paralegal working on this case for the plaintiff, and indicated that she (the juror) was sorry

---

**1.** G.M.'s motion for J.N.O.V. is summarily disposed of here in light of this Court's denial of    the plaintiff's motion for new trial.

about the verdict. She also made other unidentified statements about "aspects of the verdict." The paralegal communicated Juror # 3's statements to counsel for the plaintiff. Juror # 3 also called counsel's office on the morning of October 30, 1987, and spoke with his partner about the jury deliberations. The partner filed an affidavit stating that he understood Juror # 3 to say that she would have held out for the plaintiff but for the harassing actions of the other jurors. That same day, counsel's partner relayed the fact of his conversation with Juror # 3 to counsel for the plaintiff.

On November 2, 1987, counsel discussed "the gist" of this October 30 conversation with Juror # 3. The following day, counsel contacted the Delaware Disciplinary Counsel to discuss the propriety of communicating directly with Juror # 3. The Disciplinary Counsel referred plaintiff's attorney to the Chairman of the Delaware State Bar Association's Ethics Committee. On November 3, 1987, the Chairman verbally advised the attorney that there was no rule prohibiting him from contacting Juror # 3,[2] and the Chairman forwarded to plaintiff's attorney a draft opinion to that effect.[3]

On November 4, 1987, plaintiff's counsel met with Juror # 3 to discuss the events which occurred on October 29 pertaining to the jury's deliberations. Juror # 3 subsequently executed an affidavit indicating that, on that date, she was the only hold-out in an otherwise unanimous jury favoring a verdict for the defendants. Juror # 3 stated that after the judge's response to their written question, and on their way back to the jury room, a member or members of the jury asked the bailiff if they could tell the Court that the "jury was hung", and request that they be permitted to go home. According to the affidavit, the bailiff responded "No. The Judge will send you home and bring you back tomorrow." At that point, several jurors allegedly became angry, and voiced their displeasure at having to return for another day of deliberation. Upon recommencing deliberations in the jury room, other members of the jury allegedly began to cast "angry and vicious remarks" at Juror # 3. The affidavit recited that she intended to remain a hold-out, understanding that a hung jury would necessitate a re-trial. However, as a result of the derogatory remarks of several other jurors, including one comment with religious overtones, Juror # 3 felt "harassed" and "embarassed". Juror # 3 claimed that as a result of "the pressure brought to bear upon her" by the other jurors, she became "unglued", relinquished her hold-out position, and cast her verdict in favor of the defendant. She concluded that had it not been for the bailiff's comment, and the ensuing verbal attack by the other jurors in the jury room, she would have remained a hold-out.

Plaintiff contends that the bailiff's statement and the purported intimidating actions of the other jurors constitute an extraneous influence improperly brought to bear upon Juror # 3. Plaintiff requests that a post-verdict evidentiary hearing be held in order to hear evidence, particularly the testimony of Juror # 3, pertaining to the allegedly extraneous matter received during jury deliberation.

■ As a general rule, a juror may not impeach his own verdict once the jury has been discharged.[4] *Stein v. New York*, 346

---

2. Counsel stated in his affidavit that the results of his independent research comported with the Chairman's opinion that there was no impropriety in his making contact with Juror # 3. Counsel, however, offered no authority in support of his conclusion.

3. Since G.M. challenges *inter alia,* the propriety of the *ex parte* contact, the events leading up to plaintiff's attorney meeting with Juror # 3 are set forth in detail.

4. *See generally,* E. Cleary, et al., *McCormick on Evidence* § 68 (3d Ed.1984 & Supp.1987); 8 J. Wigmore, *Evidence* §§ 2345–2356 (McNaughton Rev.1961); 3 Gard, *Jones on Evidence* § 20:58 (6th ed. 1972 & Supp.1987); Annot, *Competency of Juror as Witness, Under Rule 606(b) of Federal Rules of Evidence, Upon Inquiry into Validity of Verdict or Indictment* 65 A.L.R.Fed. 835 (1983 & Supp.1987); Mueller, *Jurors Impeachment of Verdicts and Indictments in Federal Court Under Rule 606(b),* 57 Neb.L.Rev. 920 (1978); Thompson, *Challenge to the Decision Making Process— Federal Rule 606(b) and the Constitutional Right to a Fair Trial,* 38 S.W.L.J. 1187 (1985); Comment, *Juror Privilege: The Answer to the Impeachment Puzzle?,* 3 Wes.N.Eng.L.Rev. 447

U.S. 156, 178, 73 S.Ct. 1077, 1089, 97 L.Ed. 1522 (1953); *McDonald v. Pless,* 238 U.S. 264, 267, 35 S.Ct. 783, 784, 59 L.Ed. 1300 (1915); *Hyde v. United States,* 225 U.S. 347, 384, 32 S.Ct. 793, 808, 56 L.Ed. 1114 (1912). The rationale underlying the prohibition against receipt of a juror's post-verdict testimony to impeach the verdict was aptly stated as early as 1912, when this Court said:

> If this [impeachment of a verdict] were allowed, all a juror would have to do if he wanted to have a verdict set aside, would be to say to somebody else that it was found irregularly. It would put the verdict of a jury entirely in the hands of one juror.

*Spahn v. People's Railway Company,* Del. Super., 92 A. 727, 731 (1912) *quoting State v. Harmon,* 4 Pennewill 58 (1902). *See also Polk's Lessee v. Minner,* Del.Supr., 1 Del.Cas. 59, 60 (1795). This Court recognized that:

> the danger of allowing one juror, or several jurors, to impeach their verdict ... would open the door to incalculable trouble, and seriously impair the value of jury trials.

*Spahn,* 92 A. at 731.[5]

The Delaware Courts have steadfastly clung to the wisdom of the rule. In *State v. Watson,* Del.Super., 186 A.2d 543 (1961), *aff'd, Watson v. State,* Del.Supr., 184 A.2d 780 (1962), this Court, characterizing the prohibition against juror impeachment of verdicts as a "salutary rule of public policy ... whose purpose it is to protect the privacy of the jury room", explained that the rule's purpose

is to prevent over zealous litigants and a curious public from prying into deliberations which are intended to be, and should be, private, frank, and free discussions of the questions under consideration. Further, if after being discharged and mingling with the public, jurors are permitted to impeach verdicts which they have rendered, it would open the door for tampering with jurors and would place it in the power of a dissatisfied or corrupt juror to destroy a verdict to which he had deliberately given his assent under sanction of an oath.[6]

186 A.2d at 544. *See* 89 C.J.S. *Trial* § 523 (1955 & Supp.1985).

Recognizing the "sound reasons for limiting after-the-fact inquiries into jury verdicts", the Delaware Supreme Court later observed that if no limits were placed on a juror's ability to impeach his verdict,

> [j]urors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference.

*Styler v. State,* Del.Supr., 417 A.2d 948, 952 (1980) *quoting McDonald v. Pless,* 238 U.S. 264, 267, 35 S.Ct. 783, 784, 59 L.Ed. 1300 (1915).[7] The Delaware Supreme Court recently summed up the policy considerations supporting the prohibition against juror impeachment of a verdict. In

---

(1981). Note, *Impeachment of Jury Verdicts,* 53 Marq.L.Rev. 258 (1970).

**5.** The *Spahn* Court found that there is no difference between a civil case and a criminal case so far as the principle of impeachment of a verdict is concerned. *Spahn,* 92 A. at 730. *Accord,* Graham, *Handbook of Federal Evidence* § 606.2, at 403 (1981 & Supp.1988).

**6.** It has also been suggested that the no impeachment rule operates to prevent fraud by individual jurors. 3 Weinstein & Berger, *Weinstein's Evidence* ¶ 606[3], at 606–23 (1985), *citing e.g., United States v. Eagle,* 8th Cir., 539 F.2d 1166 (1976), *cert. denied,* 429 U.S. 1110, 97 S.Ct.

1146, 51 L.Ed.2d 563 (1977); ("A central purpose of the rule of juror incompetency is the prevention of fraud by individual jurors who could remain silent during deliberations and later assert that they were influenced by improper considerations.")

**7.** Moreover, full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of post verdict scrutiny of juror conduct. *See* Note, *Public Disclosures of Jury Deliberations,* 96 Harv. L.Rev. 886, 888–892 (1983).

*Sheeran v. State*, Del.Supr., 526 A.2d 886 (1987), the Court articulated those reasons:

1) discouraging harassment of jurors by losing parties eager to have the verdict set aside; 2) encouraging free and open discussion among jurors; 3) reducing incentives for jury tampering; 4) promoting verdict finality; and 5) maintaining the viability of the jury as a judicial decision-making body ... *Id.* at 894.

The Courts in this State, however, have also recognized that the bar against post-verdict juror testimony is not absolute. Since our system of justice is founded upon the notion that the decisions which a jury reaches "be induced only by evidence and argument in open court and not by any outside influence", *Sheeran*, 526 A.2d at 894–95,[8] *citing Patterson v. Colorado*, 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907), "a flat prohibition against receiving post-verdict testimony from jurors would contravene another important public policy: that of " 'redressing the injury of the private litigant where a verdict was reached by a jury that was not impartial.' " *Sheeran*, 526 A.2d at 894–95. *Cf.* Note, *Constitutional Law: Rule Prohibiting Impeachment of Verdicts by Jurors as Deprivation of Due Process*, 14 Okl.L.Rev. 533, 535 (1961). In an effort to accommo-

date the conflicting policies of preserving both the sanctity of a jury's deliberations and the defendant's right to be adjudicated liable based only on competent evidence presented in open court, "Courts have distinguished between extrinsic and intrinsic influences upon a jury's verdict." *Sheeran*, 526 A.2d at 895. *See Barnes v. Toppin*, Del.Supr., 482 A.2d 749 (1984). The "extraneous influence exception" permits a juror to "testify to any facts bearing upon the question of the existence of any extraneous influence, although not as to how far that influence operated upon his mind." *Mattox v. U.S.*, 146 U.S. 140, 148–149, 13 S.Ct. 50, 53, 36 L.Ed. 917, 921 (1892). This standard has been codified by the Federal Rules of Evidence and the Delaware Rules of Evidence. (F.R.E. and D.R.E. 606).[9]

Extraneous or extrinsic influences [10] have been construed to cover 1) exposure of jurors to news items about the matters pending before the jury, 2) consideration by the jury of extra record facts about the case, 3) communications between third parties and jurors relevant to the case to be decided and 4) pressures or partiality on the part of the court. *Government of Virgin Islands v. Gereau*, 3d Cir., 523 F.2d 140, 150 (1975), *cert. den. Gereau v. Government of Virgin Islands*, 424 U.S.

---

**8.** While the *Sheeran* Court was referring to the criminal justice system, the expectation that a jury's verdict will be founded solely on evidence presented in court applies equally to civil cases.

**9.** Rule 606(b), COMPETENCY OF JUROR AS WITNESS. *Inquiry into Validity of Verdict or Indictment.* Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

**10.** The 606(b) exclusionary principle is actually qualified by two major exceptions, which are

defined in terms of thrust or subject. *See* 3 D. Louisell & C. Mueller, *Federal Evidence* § 286, at 111 (1979 & Supp.1987). The first is "extraneous prejudicial information brought to the jury's attention" and the second is "outside influence which improperly has been brought to bear upon a juror". This distinction between the two exceptions is best illustrated by the Report of the Committee of the Judiciary, House of Representatives, 93rd Cong., 1st Sess. No. 93–650, Nov. 15, 1973, at pps. 9–10, in which the House Judiciary Committee and its Special Subcommittee on Reform of the Federal Criminal Laws, observed:

[Under Rule 606(b), a juror] could testify as to the influence of extraneous prejudicial information brought to the jury's attention (e.g. a radio newscast or a newspaper account) or an outside influence which improperly had been brought to bear upon a juror (e.g. a threat to the safety of a member of his family), but he could not testify as to other irregularities which occurred in the jury room.

917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976).[11] Intrinsic influences have been construed to include "discussions among jurors, intimidation or harassment of one juror by another, and other intra-jury influences on the verdict." *Id.* at 150.[12]

The rule that has therefore evolved as a result of this extraneous-intrinsic dichotomy is that "[j]urors are competent to testify about extrinsic influences but not about intrinsic influences on the verdict." *Sheeran,* 526 A.2d at 895. The issue then that this Court is to decide is whether the alleged intimidation of Juror # 3 by the other jurors, or the comments allegedly made by the bailiff, constitute an extrinsic influence upon the jury's deliberation process. If this Court concludes that either is an external influence, an evidentiary hearing may be required in order to decide whether the verdict was sufficiently tainted so as to warrant the ordering of a new trial.[13] *See Massey v. State,* Del.Supr., 514 A.2d 402, 404 (1986).

■ This Court is persuaded that any harassment or intimidation of Juror # 3 by the other jurors is an intrinsic consideration of which Juror # 3 is incompetent to testify about at an evidentiary hearing. The clear import of Rule 606(b) is that a juror is not competent to testify about his mental processes or emotional reactions in arriving at his verdict. *Burke v. State,* Del.Supr., 484 A.2d 490, 500–501 (1984).[14]

Despite plaintiff's objection to the deprecating actions of the other jurors against Juror # 3, it has long been recognized that a degree of intra-jury pressuring is inherent to the deliberation process. Such pressures however, and a juror's reaction to them, are neither extraneous information nor outside influence. Rather, they are an inherent and intrinsic part of the deliberative process. *See Lovett v. State,* Del. Supr., 516 A.2d 455, 475 (1986), cert. denied, 481 U.S. 1018, 107 S.Ct. 1898, 95 L.Ed.2d 504 (1987). As Justice Holland recently observed in *Sheeran:*

> During the course of jury deliberations there are numerous pressures which are brought to bear upon the jurors, particularly those who find themselves in a minority position. It is unthinkable that such pressures would not exist, and they undoubtedly multiply as the size of the minority diminishes. (Citations omitted). One would expect that those in the majority would argue forcefully in an attempt to persuade those in the minority to accept the views of the majority. (Citations omitted). However, it is generally held that jurors may not impeach their verdict by testimony that it resulted from coercion or majority vote.[15] (Citations omitted).

526 A.2d at 896–97.

Here, there is no suggestion that Juror

---

11. *See also, Hughes v. State,* Del.Supr., 490 A.2d 1034 (1985); *McCloskey v. State,* Del.Supr., 457 A.2d 332 (1983); regarding what constitutes extrinsic or extraneous influences.

12. For exhaustive coverage of the distinction between extrinsic and intrinsic influences under Rule 606(b), including extensive discussion of the applicable case law, *see* Graham, *Handbook of Federal Evidence* § 606.2 (1981 & Supp.1988); 3 D. Louisell & C. Mueller, *Federal Evidence* §§ 287–289 (1979 & Supp.1987); 3 Weinstein & Berger, *Weinstein's Evidence* ¶ 606[04] (1984 & Supp.1986). *See also,* Carlson & Sumberg, *Attacking Jury Verdicts: Paradigms for Rule Revision,* 1977 Ariz.St.L.J. 247 (1977); Comment, *Impeachment of Verdicts by Jurors—Rule of Evidence 606(b),* 4 Wm.Mitch.L.Rev. 417 (1978); Comment, *Impeachment of Jury Verdicts,* 25 U.Chi.L.Rev. 360 (1958).

13. Despite plaintiff's insistence that she is entitled to a new trial as a result of the allegedly extraneous influences, Rule 606(b) does not

equate with, nor does it govern, grounds for a new trial. Rather, it governs, in the first place, the competency of jurors to testify concerning the jury process. Cleary, et al., *McCormick on Evidence* § 68, at 166 (3d ed. 1984 & Supp.1987) (citation omitted).

14. *See also,* Fryer, "Note on Disqualification of Witnesses", *Selected Writings on Evidence and Trial* 345, 347 (Fryer ed. 1957); Maguire, Weinstein, et al., *Cases on Evidence* 887 (5th ed. 1965); S. Saltzburg & K. Redden, *Federal Rules of Evidence Manual* 458–460 (4th Ed.1986 & Supp.1987).

15. *See, Jacobson v. Henderson,* 2d Cir., 765 F.2d 12 (1985) in which the convicted defendant moved for a writ of *habeas corpus* asserting, *inter alia,* that he was denied a fair trial because of jury misconduct. Jacobsen submitted affidavits of three jurors including one which indicated that the juror "changed [his] vote to guilty out of fear." There were accounts of "scream-

# 3 was threatened with physical harm.[16] Nor is there any information that Juror # 3 voiced a complaint of undue intimidation to the court during or after the course of deliberations.[17] At the time the jury was polled, Juror # 3 affirmed the verdict. Jurors # 3's bald allegations regarding the effect of the alleged actions of other jurors upon her emotions relates to precisely the type of intra-jury influence that the prohibition in Rule 606(b) was enacted to protect from scrutiny. As such, Juror # 3's allegations are not open to further consideration.[18]

■ This Court next addresses the alleged comment by the bailiff to determine whether his statement is an extrinsic influence sufficient to warrant a post-verdict evidentiary hearing or a new trial. Plaintiff argues ostensibly that the result of the bailiff's response was to sufficiently anger the other jury members into pressuring Juror # 3 into ultimately succeeding to the will of the majority. Plaintiff alleges that since the result of the bailiff's comment was to impel a hostile reaction which manifested into harassment of Juror # 3, the comment, which occurred outside of the jury room, was an external influence.

■ A party seeking a new trial on account of jury misconduct must ordinarily make a preliminary showing, on the basis of affidavits, that misconduct sufficient to impeach the verdict has occurred, and that the movant has competent evidence to this effect. 3 D. Louisell & C. Mueller, *Federal Evidence* § 291, at 155 (1979) (citations omitted), and a defendant must prove that he was "identifiabl[y] prejudice[d]" by the alleged juror misconduct. *Hughes v. State*, Del.Supr., 490 A.2d 1034, 1046 (1985). The jury verdict will be set aside if there is a reasonable possibility that allegedly extraneous information or influences affected the verdict. Graham, *Handbook of Federal Evidence*, § 606.2, at 402–402 (1981 & Supp.1988). (citations omitted). If a party alleges the sort of misconduct about which testimony would be barred under 606(b), the Court may conclude that further inquiry would be futile. 3 Weinstein & Berger, *Weinstein's Evidence* 606[05], at 606–39 (1985 & Supp.1986) (citations omitted).

■ The moving party generally carries the burden of demonstrating misconduct. *See* 3 D. Louisell & C. Mueller, *supra*, at 160. (citations omitted). There are, how-

---

ing, hysterical crying, fist banging, name calling, and the use of obscene language," as well as an incident in which one juror allegedly threw a chair at another juror. *Henderson*, 765 F.2d at 14. In affirming the District Court's ruling denying Jacobsen relief on this ground, the Second Circuit observed that "articulate jurors may intimidate the inarticulate, [and] the aggressive may unduly influence the docile" and that "scarcely any verdict might remain unassailable, if ... statements [to impeach a jury's verdict] were admissible. *Henderson*, 765 F.2d at 15.

Similarly, in *United States v. Barber*, 4th Cir., 668 F.2d 778, *cert. denied*, 459 U.S. 829, 103 S.Ct. 66, 74 L.Ed.2d 67 (1982), two jurors indicated post-verdict that they had concerns and "felt anguish" over the verdict. One juror reported that the foreman "scared her to death". *Barber*, 668 F.2d at 786. Relying on Rule 606(b), the court noted that "[t]he law is settled that following dispersal of a jury, ... if we allow such attacks by individual members on the composite verdict of all twelve we can expect an unsettling of the system out of all proportion to any expectable improvement in the administration of justice." *Id. See also, United States v. MacQueen*, 2d Cir., 596 F.2d 76 (1979).

16. "We do not say that there can be no threat short of violence by one juror against a recalcitrant dissenter that will upset a verdict, but certainly there was nothing in the case at bar to justify such action." *United States v. Grieco*, 2d Cir., 261 F.2d 414, 415 (1958), *cert. denied Grieco v. United States*, 359 U.S. 907, 79 S.Ct. 582, 3 L.Ed.2d 572 (1959).

17. It is settled that jurors may report inappropriate juror behavior to the court before they render a verdict. *See Lee v. United States*, D.C. App., 454 A.2d 770 (1982), *cert. denied sub nom. McIlwain v. United States*, 464 U.S. 972, 104 S.Ct. 409, 78 L.Ed.2d 349, (1983) (on second day of deliberations, jurors sent judge a note suggesting that foreperson was incapacitated).

18. As Justice O'Conner recently observed in *Tanner v. United States*, 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987):
    "There is little doubt that post-verdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. It is not at all clear, however, that the jury system could survive such efforts to perfect it. *Id.* at 120, 107 S.Ct. at 2747, 97 L.Ed.2d at 106.

ever, certain classes of misconduct in which the burden is upon the party, in whose favor the verdict was rendered, to demonstrate the harmlessness of the alleged influence. Graham, *supra,* at 402–403. The question of whether prejudice resulted must be resolved by drawing inferences. *Id.* Some types of misconduct are considered presumptively prejudicial, especially in criminal, but also occasionally in civil cases, and a rebuttable presumption of prejudice may arise in favor of the moving party, depending on the misconduct alleged. *Id.* (Citations omitted). *See also,* D. Louisell & C. Mueller, *supra,* at 161. The Delaware Supreme Court has labeled these instances " 'egregious circumstances' —i.e., circumstances that, if true, would be deemed inherently prejudicial so as to raise a presumption of prejudice in favor of [the moving party]", *Massey v. State,* Del.Supr., 541 A.2d 1254, 1257 (1987). "[I]f a [party] can show that there is a reasonable probability of juror taint of an inherently prejudicial nature, a presumption of prejudice should arise that [the moving party] right to a fair trial has been infringed upon." *Id.*

A bailiff's comment to a juror which relates to the content or procedure of the jury's deliberations falls into the class of conduct that is presumptively prejudicial, *see United States ex rel. Buckhana v. Lane,* 7th Cir., 787 F.2d 230 (1986); *Gereau,* 523 F.2d 140; *United States ex rel. Tobe v. Bensinger,* 7th Cir., 492 F.2d 232 (1974); *Wheaton v. United States,* 8th Cir., 133 F.2d 522 (1943), as are remarks which indicate a view of the evidence, *see Parker v. Gladden,* 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966), or which introduce extra-record facts. *See Mattox v. United States,* 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892); *United States v. Blackston,* S.D.Ga., 547 F.Supp. 1200 (1982). *State of Louisiana v. Graham,* 422 So.2d 123 (La. 1982); *People v. Dietrich,* 87 Mich.App. 116, 274 N.W.2d 472 (1978); *Montana v. Dickens,* 198 Mont. 482, 647 P.2d 338 (1982). In contrast, statements by court personnel of a ministerial nature are generally considered to be non-prejudicial. *Cf.* 3 D. Louisell & C. Mueller, *supra,* at 146.

In *People v. Tobe,* 49 Ill.2d 538, 276 N.E.2d 294 (1971), a defendant moved for a new trial based on affidavits from three bailiffs and seven jurors that during jury deliberations, two or three inquiries from the jury regarding what would occur if the jury could not reach a verdict were made to different court personnel. In each instance, the various bailiffs told the jurors to continue to deliberate until a unanimous decision was reached. *Tobe,* 276 N.E.2d at 297. The Court found these remarks by the bailiffs to be non-prejudicial. In so doing, the Court distinguished *Parker v. Gladden,* 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966), in which a bailiff had commented to the jury that one of the parties was a "wicked fellow" and was guilty, and that "if there is anything wrong the Supreme Court will correct it." *Tobe, supra* 276 N.E.2d at 298. Similarly, in *Williams v. State,* Ala.Crim.App., 348 So.2d 1113, *cert. denied* Ala.Supr., 348 So.2d 1116 (1977), the Court denied a motion for a new trial based on a bailiff's comments to the juror. It was alleged in *Williams* that during jury deliberations, one juror knocked on the door and asked the bailiff to "tell the Judge that we can't come to a decision." The bailiff responded "There is no need for you to come out right now. You might as well go back in and deliberate some more. You come out with an answer one way or the other." Shortly thereafter the jury reached a verdict. The Court, all judges concurring, found that this did not have a prejudicial effect on Williams.

Finally, in *State v. James,* La.App., 499 So.2d 721 (1986), a defendant moved for a new trial on the basis that "an unfair time constraint was put on the jury when it was told by the deputy sheriff attending it, in response to a question by the juror, that if a decision could not be reached that night they would have to spend the night." 499 So.2d at 727. The trial court denied the motion and the court of appeals affirmed, stating, "If this conversation took place as alleged, it was not improper; the question and answer did not have anything to do with the case, the response by the deputy

was accurate, and the jury members were entitled to know, if they wanted to know, what would happen if they could not reach a verdict that night." *Id. See also State v. Forsyth*, 13 Wash.App. 133, 533 P.2d 847, 850 (1975).[19]

This Court is of the opinion that the statement allegedly made by the bailiff in this case is not prejudicial. The bailiff did not comment upon the evidence or the parties. There is no suggestion that the bailiff's remark was a deliberate attempt to influence the jury's verdict or to hasten their deliberations. In fact, Juror #3 admitted in her affidavit that the comment had no direct effect on her decision, since she persisted in her hold-out position even after the purported remark was made. And since the remark did nothing to change the decision of the other eleven jurors, it can hardly be construed as an improper influence bearing on the majority's verdict.

It is also clear that the bailiff's purported remark was not prejudicial in light of this Court's prior articulation to counsel of its decision to bring the jury back should they fail to agree. Since the Court planned to recall the jury should they be unable to decide, a statement by the bailiff to that effect amounts to nothing more than a recitation of what the result of their failure to reach unanimity would have been. Under these circumstances, there simply is nothing to support plaintiff's contention that the bailiff's comment was an extraneous, prejudicial influence which requires further inquiry. *Massey v. State, supra* at 1259.

 This Court has a very broad discretion in deciding whether a case must be retried or the juror summoned and investigated due to alleged exposure to prejudicial information or improper outside influence.

*Styler v. State*, Del.Supr., 417 A.2d 948 (1980). The Court concludes that the effect of the alleged harassment and intimidation of the other jurors falls squarely within the ambit of the prohibition of Rule 606(b), which forbids juror testimony of matters intrinsic to jury deliberations. Similarly, the purported statement of the bailiff was not an extraneous, prejudicial matter which necessitates either a post-verdict evidentiary hearing or a new trial. As such, the plaintiff's motion is DENIED.

IT IS SO ORDERED.

---

19. *And see Government of Virgin Islands v. Gereau.* In *Gereau,* the defendants were found guilty of first degree murder, first degree assault, and robbery. After the verdict was returned, it became known that a matron had communicated with one of the jurors. On that basis defendants moved for a new trial. The juror testified: "She [the matron] just asked me how everything is going and I tell her not so good. And I say two of them that don't understand, they don't come in yet. And she say to me she want them to hurry up so she can get to go home, that is all." *Gereau,* 523 F.2d at 147. The juror also testified it did not affect her decision. The Court found that the matron's statement had no effect on the verdict and denied the motion for a new trial.